**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA,**

      v.                                      **CRIMINAL NO.  16-152-2 (APM/GMH)**

**RONNIE ISBY,**

      **Defendant.**

**DETENTION MEMORANDUM**

This matter comes before the Court upon the application of the United States that Defendant, Ronnie Isby, be detained pending trial.  Defendant has been charged by Indictment with one count of Conspiracy to Distribute and Possession with Intent to Distribute 100 Grams or More of Heroin, in violation of 21 U.S.C. §§ 841 and 846, and four counts of Unlawful Distribution of Heroin, in violation of 21 U.S.C. § 841.  The United States requested a detention hearing under 18 U.S.C. § 3142(f)(1)(C) which the Court held on September 2, 2016.  The Court now finds that Defendant should be held without bond.  This memorandum is submitted in compliance with the statutory obligation that "the judicial officer shall . . . include written findings of fact and a written statement of the reasons for the detention."  18 U.S.C. § 3142(i)(1).

**FINDINGS OF FACT**

At the detention hearing, the United States proceeded by proffer based on the Indictment.  The defense offered no contrary evidence.  Accordingly, the Court makes the following findings of fact:

Using a confidential source ("CS"), the Bureau of Alcohol, Tobacco, and Firearms ("ATF") conducted a series of controlled drug purchases from Defendant spanning from June to August 2016.  Those drug transactions are detailed below.

### A. June 28, 2016 Controlled Purchase

On June 28, 2016, ATF agents conducted a controlled purchase of approximately 20 grams of suspected heroin using the CS. On June 28, 2016, ATF special agents met with the CS at a "staging location." With law enforcement present, at approximately 10:40 a.m., the CS called Defendant, who reported that "they" were located at the McDonalds at 2529 Good Hope Road, Southeast, Washington, D.C. The CS and Defendant had earlier corresponded via text message to plan this transaction. Before the CS departed for the purchase location, the CS and its vehicle were searched by an ATF agent and no contraband was found. The CS was given $1,700.00 in official pre-recorded government funds in order to conduct the controlled purchase and was also given an audio recording/transmission device.

At approximately 10:47 a.m., the CS headed to the McDonalds where Defendant was located. Once the CS arrived, surveillance units observed Defendant enter the passenger side of the CS's vehicle. Defendant told the CS to drive to the Park Naylor Apartments in order for them to conduct their deal. The CS drove to that location and parked in its parking lot. Surveillance units observed the vehicle parked at this location. The CS then purchased approximately 20 grams of suspected heroin from Defendant for $1,700.00. The CS and Defendant drove away from the apartments with the intention of returning to the McDonalds to drop off Defendant. While en route to the McDonalds, Defendant received a phone call and requested that the CS drop him off at a different location. The CS did this and then returned to the staging location. At the staging location, the CS gave the suspected heroin and the audio recording/transmission device to an ATF agent. Agents conducted a second search of the CS and the CS's vehicle and no contraband was found. The substance the CS purchased, with

packaging, weighed approximately 20 grams. ATF agents field-tested a portion of the substance and it yielded a positive reaction for heroin.

**B.     July 8, 2016 Controlled Purchase**

On July 8, 2016, ATF agents conducted a second controlled purchase of approximately 47 grams of suspected heroin from Defendant using the CS. On that day, ATF agents met with the CS at a staging location. Prior to this meeting, the CS spoke with Defendant via text message to arrange the transaction. Surveillance units were staged at the same McDonalds from the first controlled purchase and they observed Defendant exit the McDonalds and then wait with an unidentified male on Good Hope Road, Southeast, Washington, D.C. As before, agents searched the CS's vehicle before it departed the staging area. No contraband was found. The CS was given $4,250.00 in official pre-recorded government funds in order to conduct the controlled purchase and was given an audio recording/transmission device.

At approximately 10:54 a.m., the CS departed the staging location and headed toward Defendant's location. Once the CS arrived in the McDonalds' parking lot, surveillance units observed Defendant enter the CS's vehicle. Defendant told the CS to drive to the CVS store located at 2646 Naylor Road, Southeast, Washington, D.C. in order to conduct the purchase. The CS drove there and parked in the store lot. Surveillance units observed the vehicle parked at this location. The CS then purchased from Defendant approximately 47.1 grams of suspected heroin for $4,250.00. The CS departed around 11:08 a.m. and returned to the McDonalds to drop off Defendant. Defendant exited the CS's vehicle and surveillance units then observed Defendant meeting with a person inside a gold Cadillac SUV. Officers were not able to retrieve the license plate number on the Cadillac during this controlled purchase, but an agent was later

able to identify the driver of the vehicle as Defendant's co-defendant, Kevin Brown.

The CS departed the McDonalds a few minutes later and returned to the staging location. At the staging location, the CS gave the suspected heroin and the audio recording/transmission device to an ATF agent. A second search of the CS and the CS's vehicle revealed no contraband. The purchased substance, with packaging, weighed approximately 47.1 grams. The substance was packaged in two bags, both of which the agents weighed. The first weighed approximately 36 grams and the second weighed approximately 11.1 grams. Additionally, the substances in each bag field-tested positive for heroin.

### C.   July 20, 2016 Controlled Purchase

On July 20, 2016, ATF agents conducted a third controlled purchase of approximately 49 grams of suspected heroin using the CS. On July 20, 2016, ATF agents met with the CS at a staging location. Again, the CS had corresponded with Defendant via text message prior to this in order to arrange the upcoming drug transaction. Surveillance units were posted at the same McDonalds from the first two controlled purchases and they observed Defendant inside the McDonalds at approximately 9:30 a.m. Surveillance units next observed Defendant enter a gold Cadillac SUV with District of Columbia license plate number ER-8688 at approximately 10:08 a.m. This license plate was registered to "Kevin M. Brown" – Defendant's co-defendant in this case. Surveillance units observed the gold Cadillac exit the McDonalds' parking lot and later observed it parked in a lot next to 2446 Wagner Street, Southeast, Washington, D.C. The ATF agent that observed the gold Cadillac in the McDonalds' parking lot was later shown a photograph of co-defendant Brown and confirmed that the driver of the vehicle was Brown.

Before the CS departed the staging area, it received a phone call from Defendant, who

stated he would be at the purchase location by 11:15 a.m. ATF agents searched the CS and its vehicle and found no contraband. The CS was given $4,250.00 in official pre-recorded government funds in order to conduct the controlled purchase and was also given an audio recording/transmission device.

At approximately 11:17 a.m., the CS departed the staging location and headed to the McDonalds. At this same time, the CS received a call from Defendant, who reported that he was at the McDonalds. The CS arrived at the McDonalds at approximately 11:22 a.m. At around 11:23 a.m., surveillance units observed Defendant meeting a person in the gold Cadillac, which was parked on the corner of 25th Street and Good Hope Road, Southeast, Washington, D.C. Around this time, the CS received another phone call from Defendant in which he stated that he was currently obtaining the heroin and that the CS should wait at the McDonalds. The ATF agent that observed Defendant meet with the person in the gold Cadillac was later shown a picture of co-defendant Brown and confirmed that Brown was the driver of that car.

After picking up the narcotics from Brown, Defendant headed to the McDonalds to meet the CS. At approximately 11:29 a.m., Defendant entered the CS's vehicle. Once inside, Defendant asked if the CS had a digital scale and the CS stated it did not. Defendant directed the CS to a vehicle parked on Good Hope Road, Southeast, out of which Defendant retrieved a digital scale. Defendant then told the CS to drive to the Park Naylor Apartments. Surveillance units observed the CS drive to and park at that location. The CS purchased narcotics from Defendant at this location and the two returned to the McDonalds. The CS stopped on the street in front of the McDonalds and Defendant exited the vehicle at approximately 11:38 a.m. Surveillance units then observed Defendant enter the passenger side of the gold Cadillac, which

departed the area at approximately 11:43 a.m.

The CS departed the McDonalds at approximately 11:38 a.m. and returned to the staging location. Once there, the CS gave the suspected heroin and the audio recording/transmission device to an ATF agent. A second search of the CS and the CS's vehicle was conducted and no contraband was found. The substance the CS purchased, with packaging, weighed approximately 49 grams. Additionally, the substance field-tested positive for heroin.

### D.     August 4, 2016 Controlled Purchase

On August 1, 2016, the CS contacted Defendant to set up yet another purchase of heroin, this time a quantity of 50 grams. The CS proposed the sale to occur on August 4, 2016. Defendant confirmed the meeting and the planned purchase. Further, on August 2, 2016, an examination of pen register activity of co-defendant Brown's telephone number showed four contacts between Brown's telephone and one of two telephone numbers used by Defendant.

On August 4, 2016, ATF agents, along with agents from the FBI, conducted a fourth controlled purchase of approximately 48.1 grams of suspected heroin from Defendant using the CS. Surveillance units were staged at the same McDonalds from the first three controlled purchases and they observed Defendant inside the McDonalds at approximately 9:30 a.m.

That morning, ATF and FBI agents met with the CS at a staging location. ATF agents searched the CS and its vehicle and found no contraband. The CS was given $4,250.00 in official pre-recorded government funds in order to conduct the controlled purchase and was given an audio recording/transmission device.

At approximately 10:29 a.m., the CS departed the staging location and headed to the agreed-upon purchase location, which was, as before, the McDonalds. The CS arrived at the

McDonalds at approximately 10:36 a.m. and surveillance units observed Defendant enter the CS's vehicle. Further, while Defendant was waiting for his supplier to show up with the heroin, and while Defendant was waiting with the CS, the CS heard Defendant say, "What the fuck is Kevin doing?" Defendant also stated that "he" – presumably Brown – informed him that he wasn't that far away at the time.

At approximately 10:48 a.m., surveillance units observed the gold Cadillac registered to Brown parked, unoccupied, in the 2000 block of Savannah Terrace, Southeast, Washington, D.C. Then, at 10:50 a.m., Defendant was overheard on a phone call by the CS's transmission device. During this call agents heard Defendant ask, "You by Savannah?" The CS later reported that during this call, Defendant looked at his cell phone and said that "his" (presumably Brown's) phone call was cut off but that Defendant understood that "he" (presumably Brown) was near a barber shop on Savannah Terrace, Southeast. Defendant then told the CS to drive them to that location.

At approximately 10:56 a.m., surveillance units observed the CS depart the McDonalds and travel with Defendant to the Alabama Plaza Shopping Center located in the 2200 block of Alabama Avenue, Southeast, Washington, D.C. A barber shop and a convenience store are among the stores located in this shopping center. Upon arriving at the shopping center, Defendant exited the CS's vehicle and walked into the convenience store. He returned to the CS's vehicle some time later. Once he returned, Defendant told the CS that "he" – presumably Brown – wanted 2 grams taken out of the bag of heroin because there were more than 50 grams of heroin in the bag. Once those 2 grams were placed in a separate bag, the CS purchased the remaining 50-gram bag of heroin. Defendant then took the money and bag with approximately 2

grams of heroin back into the convenience store at around 11:06 a.m.

At approximately 11:08 a.m., Defendant re-entered the CS's vehicle. The CS departed the shopping center and returned to the McDonalds, at which time Defendant departed. After Defendant's departure, the CS returned to the staging location. At the staging location, the CS gave the suspected heroin and the audio recording/transmission device to an ATF agent. A second search of the CS and its vehicle uncovered no contraband. The substance in the bag the CS purchased, with packaging, weighed approximately 48.1 grams. Additionally, the substance yielded a positive field test for heroin.

### E.  August 31, 2016 Controlled Buy and Arrest

The final drug purchase occurred on August 31, 2016. On that day, Defendant sold 47.8 grams of suspected heroin to the CS. The government provides no details as to the time of the purchase, how it was observed and recorded, and whether the substance purchased field-tested positive for heroin. Defendant was arrested sometime after this final controlled purchase. At the time of his arrest, Defendant had $4,068.00 on his person, which included pre-recorded funds from the controlled purchase. When co-defendant Brown was arrested, he had $2,039.00 on his person.

### F.  Defendant's Criminal Record

Defendant has a lengthy criminal record, including numerous drug-related convictions. All of Defendant's convictions occurred in the D.C. Superior Court. Those convictions include: (1) a 2011 conviction for attempted possession with intent to distribute heroin; (2) 2014, 2006, and 2004 convictions for heroin possession; (3) 2009 and 1996 convictions for distribution of heroin; (4) 2008 and 1991 convictions for possession of cocaine; (5) a 2004 conviction for

possession of drug paraphernalia; (6) a 1981 armed robbery conviction; and (7) a 1980 conviction for attempted robbery. Defendant is currently on post-release supervision for the 2011 conviction after serving 30 months in prison. Additionally, Defendant committed the instant offenses while on pre-trial release in yet another Superior Court matter in which he is charged with selling narcotics.[1] Finally, Defendant's probation or supervised release in connection with his prior offenses has been revoked on at least four occasions.

## DISCUSSION

### A. Legal Standard

The Bail Reform Act of 1984, 18 U.S.C. § 3142 et seq., provides, in pertinent part, that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). Thus, even absent a flight risk, danger to the community alone is sufficient reason to order pretrial detention. United States v. Salerno, 489 U.S. 739, 755 (1987); United States v. Perry, 788 F.2d 100, 113 (3d Cir. 1986); United States v. Sazenski, 806 F.2d 846, 848 (8th Cir. 1986). Where the judicial officer's justification for detention is premised upon the safety of the community, the decision must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f). Where the justification for detention is the judicial officer's finding that no set of conditions will assure the defendant's appearance in court, such a decision must be supported by a preponderance of the evidence. See United States v. Simpkins, 826 F.2d

---

[1] This ongoing Superior Court matter concerns an alleged sale of narcotics not charged in the present case. The government represented at the detention hearing that it may seek a superseding indictment to add a charge based on that conduct to this prosecution.

94, 96 (D.C. Cir. 1987).[2]

Where there is probable cause to believe that the defendant has committed certain types of offenses, a rebuttable presumption arises that defendant constitutes a danger to the community and no pretrial release condition or combination of conditions may be imposed to reasonably assure the safety of the community if he is released. See 18 U.S.C. § 3142(e); United States v. Mosuro, 648 F. Supp. 316, 318 (D.D.C. 1986) (holding that a grand jury indictment established probable cause sufficient to create a rebuttable presumption under Section 3142(e)). One such type of offense is an offense for which a maximum term of imprisonment of ten years or more is prescribed under the Controlled Substances Act, 21 U.S.C. § 801 et seq. 18 U.S.C. § 3142(e)(3)(A). Here, Defendant's most serious drug offense carries a maximum penalty of forty years in prison. 21 U.S.C. § 841(b)(1)(C). This offense triggers the rebuttable presumption under section 3142(e).

Once the rebuttable presumption is triggered, it imposes a burden of production on the defendant "to offer some credible evidence contrary to the statutory presumption." See United States v. Alatishe, 768 F.2d 364, 371 (D.C. Cir. 1985). As this Court recently emphasized, "[w]hile the burden of production may not be heavy, the applicable cases all speak in terms of a defendant's obligation to introduce 'evidence.'" United States v. Lee, Crim. Action No. 16-0023-4 (ABJ), 2016 WL 3659892, at *3 (D.D.C. July 1, 2016) (citations omitted). Thus, some actual evidence and not mere speculation must be offered to rebut the presumption. In the face of the presumption, which "reflects Congress's substantive judgment that particular classes of

---

[2] The government sought Defendant's detention both on the basis of danger to the community and on the ground that Defendant is a flight risk. Because the Court finds that Defendant should be detained without bond based on the danger he poses to the community, the Court need not assess whether Defendant presents a serious risk of flight as well.

offenders should ordinarily be detained prior to trial," a defendant "should 'present all the special features of his case' that take it outside 'the congressional paradigm [.]'" United States v. Stone, 608 F.3d 939, 945–46 (6th Cir. 2010) (quoting United States v. Jessup, 757 F.2d 378, 387 (1st Cir. 1985)); see also United States v. Bess, 678 F. Supp. 929, 934 (D.D.C. 1988) (finding that the presumption "represents Congress' general factual view about the special flight risks and the special risks of danger to the community presented by defendants who commit the crimes to which it attaches").

That said, the burden of persuasion on the issue of detention remains, as always, with the government. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). But even where the defendant offers evidence to rebut the presumption, the presumption is not erased. Rather, the "presumption is incorporated into the other factors considered by this Court in determining whether to grant a conditional release and is given substantial weight." United States v. Ali, 793 F. Supp. 2d 386, 291 (D.D.C. 2011); United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986) (the section 3142(e) presumption does not disappear when rebutted, but "remains in the case as an evidentiary finding militating against release, to be weighted along with other evidence relevant to factors listed in § 3142(g)").

   B.  The Four Factors of Section 3142(g)

In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, the judicial officer considers, in addition to the rebuttable presumption: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any

person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

The government contends that Defendant cannot overcome the presumption that he should be held without bond in this case. The grand jury's indictment establishes probable cause exists to believe that Defendant distributed substantial quantities of heroin. Furthermore, the government contends that its case against Defendant is strong given the substantial surveillance and multiple controlled drug purchases at issue here. The amounts involved trigger not only a heavy maximum penalty but also a five-year mandatory minimum sentence. Indeed, the government represents that with the statutory sentence enhancements it will pursue, Defendant's mandatory minimum period of incarceration will be ten years. The government believes Defendant is a "career offender" based on his criminal history of drug-related convictions. Additionally, the government notes that Defendant's conduct violated the conditions of supervision for his 2011 conviction and his pretrial release in the 2016 Superior Court matter, thus demonstrating that Defendant will not comply with conditions of supervision in this case if he is released. Finally, the government believes that Defendant should be detained to prevent him from continuing in his practice of large-scale distribution of heroin in the community. The U.S. Pretrial Services Agency concurs in the government's view that no release conditions could reasonably assure the safety of the community if Defendant was released.

Defendant asserts that pretrial detention is unwarranted in this case. Defendant emphasized that he is not a flight risk in this case because he is a lifelong Washington resident and has not failed to appear at any prior court proceeding, as evidenced in his Pretrial Services report. He has also complied with release conditions in other cases, excluding the arrest underlying this case. On the issue of dangerousness, Defendant asserts that he is not a danger to

the community but instead suffers from long-term drug addiction. He contends that he sold drugs in order to fuel that addiction. He points to the evidence that he had, at the time of his arrest, cash traceable primarily to the government's pre-recorded funds used by the CS in the controlled drug purchases. To Defendant, this indicates that he is not making large profits from his drug sales but is instead focused on selling drugs to facilitate purchase of drugs for himself. Defendant proposed that he be placed in a residential drug treatment facility rather than endure pre-trial incarceration. In Defendant's view, placement in a residential treatment center would satisfy any concerns about his continued use or distribution of narcotics.

1. <u>Nature and Circumstances of the Charged Offense</u>

The first factor, the nature and circumstances of the charged offense, favors detention. This factor asks the Court to consider "the nature and circumstances of the offense charged" as a general matter, but points especially to instances where "the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." <u>Id.</u> § 3142(g)(1). Here, the government established probable cause to believe Defendant engaged in a conspiracy to distribute heroin. The Court is cognizant that heroin is extremely harmful to the user and to the community, which bears the cost of drug treatment programs and of the violence that often accompanies drug use. Further, Defendant faces a maximum of forty years and a minimum of five years in prison, a significant penalty that reflects the seriousness of the offense. The rebuttable presumption Congress created for Defendant's drug offenses reflects its judgment that persons who commit these offenses pose a substantial threat to the safety of the community. <u>See</u> 18 U.S.C. § 3142(e)(3)(A); <u>Bess</u>, 678 F. Supp. at 934.

### 2. The Weight of the Evidence

The Court finds that the weight of the evidence also favors detention. Defendant's participation in drug trafficking was recorded by the CS and observations of law-enforcement surveillance units. The substances purchased also corroborate the allegations because they field-tested positive for heroin. The evidence thus establishes probable cause to believe that Defendant planned and completed at least five substantial heroin sales. As a result, the government's case against Defendant is strong.

### 3. The History and Characteristics of the Defendant

This factor also supports detention. Section 3142 directs the Court to consider: (1) the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (2) whether, at the time of the current offense or arrest, the defendant was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law. 18 U.S.C. § 3142(g)(3)(A)–(B).

The Court does not find any suggestion that Defendant's history and characteristics overcome the presumption of dangerousness. Defendant has a dizzying array of prior drug convictions, including convictions for distribution of heroin – precisely the same conduct at issue in this proceeding. Moreover, through the instant offenses, Defendant has violated not only the terms of his post-release supervision for his 2011 drug conviction, but also the terms of his pre-trial release in an ongoing drug prosecution in Superior Court. The Court finds it very troubling that Defendant engaged in narcotics trafficking while he was under supervision in these other

drug cases. Further, Defendant's has a history of failing to comply with release conditions as indicated by his four prior probation revocations. Thus, the Court has little confidence that Defendant would comply with any conditions set by the Court if he was released here.

Defendant's representations at the hearing do little to counterbalance these facts. The Court is not persuaded that placement in a residential drug treatment facility would prevent Defendant from selling drugs. And the Court is concerned that exposing other recovering addicts to Defendant, who has a long history of distributing narcotics, may endanger those patients if he chooses to continue selling drugs while placed in such a facility. As a result, the Court finds that Defendant has not overcome the presumption of dangerousness and, even if he had, his history and characteristics would weigh in favor of detention.

4. <u>The Danger to the Community</u>

The fourth factor, the danger to the community posed by the defendant, weighs in favor of detention. As indicated above, the danger to the community posed by the distribution of controlled substances such as heroin is substantial. Further, Defendant's history of drug-related convictions and his violations of supervision support the conclusion that no conditions of supervised release might mitigate this danger.

**CONCLUSION**

Based on the consideration of all the evidence and the factors set forth in section 3142(g), the rebuttable presumption under section 3142(e)(3)(A), and all lesser restrictive alternatives to pretrial detention, the Court finds by clear and convincing evidence that no condition or combination of conditions exist that would reasonably assure the safety of any other person or of the community if Defendant was released. Therefore, the government's motion for pretrial


detention is granted.

Date:  September 6, 2016
_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE